**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| CARMELLA TIDMORE, | CASE NO. 1:24-CV-01563-AMK |
| Plaintiff, | |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | |

Plaintiff ("Plaintiff" or "Ms. Tidmore") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying her application for

Disability Insurance Benefits ("DIB").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42

U.S.C. § 405(g).  This matter is before the undersigned by consent of the parties under 28 U.S.C.

§ 636(c) and Fed. R. Civ. P. 73.  (ECF Doc. 10.)

For the reasons set forth below, the Court **AFFIRMS** the Commissioner's final decision.

## I.     Procedural History

Ms. Tidmore filed her DIB application on January 5, 2018, alleging disability beginning

on March 1, 2017.  (Tr. 78.)  The application was denied at the initial level and on

reconsideration.  (Tr. 95, 110.)  Ms. Tidmore requested a hearing before an Administrative Law

Judge ("ALJ") and testified at a hearing on September 25, 2019.  (Tr. 34-77.)  On November 8,

2019, the ALJ found she was not disabled from March 1, 2017, the alleged onset date, through

the date of the decision.  (Tr. 12-33 ("2019 decision").)  Ms. Tidmore appealed this decision to

the Appeals Council, which declined to review her request, making the ALJ's 2019 decision the

1

final decision of the Commissioner.  (Tr. 7.)  Ms. Tidmore then filed a Complaint in the Northern

District of Ohio requesting a review of the Commissioner's final decision.  (Tr. 1581.)  On

December 15, 2021, a U.S. Magistrate Judge remanded Ms. Tidmore's case to the Commissioner

with instructions for the ALJ to articulate how he considered Plaintiff's mental impairments

when formulating the Residual Functional Capacity ("RFC").  (Tr. 1581-93).

On remand, Ms. Tidmore testified at a telephonic hearing on December 1, 2022.  (Tr.

1521-40.)  The ALJ issued a second unfavorable decision on January 13, 2023, finding Ms.

Tidmore had not been under a disability since March 1, 2017, the alleged onset date.  (Tr. 1494-

1514 ("2023 decision").)  Ms. Tidmore filed the present Complaint on September 12, 2024.

(ECF Doc. 1.)  The case is fully briefed and ripe for review.  (ECF Docs. 8, 12.)

## II.      Evidence

### A.      Personal, Educational, and Vocational Evidence

Ms. Tidmore was born in 1967 and was 49 years old on the alleged disability onset date,

making her a younger individual under Social Security regulations on the alleged onset date.

(Tr. 78.)  As of the date of the 2023 decision, she was 55 years old, making her a person of

advanced age.  *See* 20 C.F.R. § 404.1563.  Ms. Tidmore has at least a high school education.

(Tr. 248.)  She has not worked since March 2017.  (Tr. 247.)

### B.      Medical Evidence

Although the ALJ identified numerous severe physical impairments (Tr. 1497), Ms.

Tidmore bases her appeal solely on the ALJ's discussion of her mental impairments, which he

found to be not severe.  (ECF Doc. 8).  The evidence summarized herein is accordingly limited

to records relating to Ms. Tidmore's depression and anxiety.

### 1.     Relevant Treatment History

Following complaints of numbness and tingling in her hands and face, Ms. Tidmore underwent a brain MRI in December 2016 that was negative for demyelinating disease but revealed an old lacunar infarction.  (Tr. 541, 544, 558, 562.)  At a primary care appointment with Ann Adwalla, DO, at Cleveland Clinic Family Health Center Independence ("CCFHC") on March 7, 2017 (Tr. 527-28), Ms. Tidmore asked Dr. Adwalla to fill out FMLA forms because she felt overwhelmed and like she could not do her job properly.  (Tr. 527.)  She also asked to try Prozac, which had been helpful in the past.  (*Id*.)  Dr. Adwalla diagnosed depression, unspecified, and indicated they would try Prozac after a neurology follow-up and testing.  (*Id*.)

Ms. Tidmore saw neurologist Atanase Romero Craciun M.D., at Cleveland Clinic Department of Neurology Independence on May 3, 2017.  (Tr. 503-04.)  Neurological and mental status examinations were normal.  (Tr. 504.)  Dr. Craciun prescribed Neurontin for nerve pain and confirmed the scheduled tilt table evaluation.  (*Id*.)  He scheduled a three-month follow-up and indicated that Ms. Tidmore was "unable to function in a high demanding multi-task environment considering the comorbidities for the time being."  (*Id*.)  Over the next four to five years, Ms. Tidmore continued to see Dr. Craciun regularly, and her neurological and mental examinations remained normal.  (*See, e.g.*, Tr. 890-92, 1242, 1767-68, 1820-21.)

Ms. Tidmore saw Dr. Adwalla again on May 16, 2017.  (Tr. 501-02.)  She reported feeling very down and not wanting to get out of bed some days.  (Tr. 501.)  She also reported bad headaches that lasted for days.  (*Id*.)  Dr. Adwalla diagnosed depression and migraine.  (Tr. 502.)  She prescribed sumatriptan for the headaches, provided a list of psychiatrists and therapists, and encouraged Ms. Tidmore to make a follow-up appointment for mental health treatment.  (*Id*.)

On July 10, 2017, Ms. Tidmore underwent an initial psychological evaluation at the CCFHC psychology office with Catherine Stenroos, Ph.D. (Tr. 878-81.) She told Dr. Stenroos that she felt overwhelmed and chronically tired and was having difficulty adjusting to not working. (Tr. 879.) She said she had dealt with mild anxiety throughout her life but had been coping fine until the onset of her recent medical problems. (*Id.*) A mental status exam showed unremarkable findings, including euthymic mood, full and appropriate affect, a well-dressed and well-groomed appearance, appropriate behavior, pleasant and interactive attitude, intact and linear associations, and appropriate insight and judgment. (Tr. 880-81.) Dr. Stenroos diagnosed Ms. Tidmore with generalized anxiety disorder ("GAD") and adjustment disorder with depressed mood. (Tr. 881.) Ms. Tidmore agreed to try cognitive behavioral therapy and mindfulness, with goals of reducing anxiety and developing coping strategies. (*Id.*)

Ms. Tidmore attended a primary care follow-up with Dr. Adwalla on September 27, 2017. (Tr. 487-88.) She was doing well, and her biggest complaint was neuropathy in her feet. (Tr. 487.) She reported migraines four times a month and said seeing a psychologist had been very helpful. (*Id.*) Dr. Adwalla recommended follow-up with psychology, noting therapy would be very good for her. (Tr. 488.) At another follow-up with Dr. Adwalla on December 27, 2017, Ms. Tidmore reported worsening anxiety that she thought was causing her headaches to worsen. (Tr. 479.) Dr. Adwalla again encouraged her to follow-up with her therapist. (*Id.*)

Ms. Tidmore attended a therapy session with Dr. Stenroos on March 8, 2018. (Tr. 1248-51.) She reported feeling anxious and depressed some days. (Tr. 1248.) Dr. Stenroos noted that Ms. Tidmore had not followed up since the July 2017 initial evaluation. (*Id.*) Ms. Tidmore appeared to be "overwhelmed with her responsibilities as well as symptoms of her medical conditions" and was "struggling with accepting loss of the work role." (*Id.*) A mental status

examination revealed anxious mood, but otherwise unremarkable findings, including well-dressed and well-groomed appearance, appropriate behavior, euthymic and engaging attitude, normal speech, full and appropriate affect, intact and linear associations, and appropriate insight and judgment.  (*Id.*)  Dr. Stenroos again diagnosed Ms. Tidmore with GAD and adjustment disorder with depressed mood.  (*Id.*)  She recommended attending individual therapy consistently and discussing psychotropic medication with a primary care provider.  (Tr. 1249.)

On April 5, 2018, Ms. Tidmore attended another therapy session, stating she felt overwhelmed with managing her health, finances, and family issues.  (Tr. 1252.)  Her mental status examination showed euthymic mood, congruent and full affect, and goal-directed, linear, and organized thoughts with no homicidal or suicidal ideations.  (*Id.*)  Dr. Stenroos encouraged Ms. Tidmore to increase self-care and use respite support to reduce her caregiver stress.  (*Id.*)  She noted that Ms. Tidmore was progressing.  (Tr. 1253.)

At a May 10, 2018 therapy session, Ms. Tidmore told Dr. Stenroos that she felt less anxious and had increased her assertiveness.  (Tr. 1257.)  Her mental status examination was unchanged from the previous month.  (*Id.*)  Dr. Stenroos continued to diagnose GAD, but instead of diagnosing adjustment disorder, she noted "some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well."  (Tr. 1258.)  At a June 6, 2018 appointment, Ms. Tidmore continued to have a normal mental status examination and reported that she was continuing to work on interpersonal boundaries.  (Tr. 1262.)

Ms. Tidmore attended a primary care visit with Dr. Adwalla on June 12, 2018.  (Tr. 1267-73.)  She said she felt very fatigued and lacked energy.  (Tr. 1267.)  She and Dr. Adwalla discussed contributing factors, including certain medications and depression, but Ms. Tidmore

5

said her sessions with Dr. Stenroos were going well.  (*Id.*)  Her diagnoses and medications continued unchanged.  (Tr. 1268.)

Ms. Tidmore was a "no show" for a July 9, 2018 therapy appointment.  (Tr. 1274.)

On October 11, 2018, Ms. Tidmore attended an appointment with Christy J. Samaras, DO, in hematologic oncology to monitor her monoclonal paraproteinemia.  (Tr. 1334-42.)  She reported that she had been under a lot of stress and felt depressed to the point it was sometimes hard to leave her bed.  (Tr. 1335.)  She denied thoughts or plans of suicide and indicated she was seeing a counselor.  (*Id.*)  Dr. Samaras recommended that Ms. Tidmore continue with her counselor and seek referral to a psychiatrist.  (Tr. 1342.)

Ms. Tidmore attended a primary care follow up with Dr. Adwalla on December 14, 2018.  (Tr. 1370-78.)  She continued to complain of fatigue and agreed to try medication for her depression and anxiety.  (Tr. 1370.)  Dr. Adwalla prescribed Celexa and instructed Ms. Tidmore to call in one month to discuss its effectiveness.  (*Id.*)

On April 11, 2019, Ms. Tidmore returned to see Dr. Samaras to monitor her monoclonal paraproteinemia.  (Tr. 1402-19.)  She reported that she felt fatigued and in pain, but that Celexa had "significantly helped" her anxiety and depression.  (Tr. 1403.)

On April 17, 2019, Ms. Tidmore attended another therapy session with Dr. Stenroos.  (Tr. 1426-30.)  She was 20 minutes late to the session.  (Tr. 1426.)  On mental examination, her mood was euthymic, her affect congruent and full, and her thoughts/associations goal directed and linear.  (*Id.*)  She expressed no suicidal or homicidal ideations.  (*Id.*)  However, Dr. Stenroos noted that Ms. Tidmore's progress was "fluctuating" and adjusted her diagnosis to simply "depressive disorder NOS."  (Tr. 1427.)

Ms. Tidmore attended a primary care follow up with Dr. Adwalla on May 1, 2019, after being involved in a car accident in late April.  (Tr. 1448-56.)  She complained of some neck stiffness but said a heating pad was helping.  (*Id.*)  Her anxiety was better controlled on Celexa. (*Id.*)  Dr. Adwalla diagnosed her with severe episode of recurrent major depressive disorder without psychotic features and refilled her Celexa prescription.  (Tr. 1448-49.)

On May 15, 2019, Ms. Tidmore returned to see Dr. Stenroos.  (Tr. 1457-61.)  Her mental status examination was normal, with euthymic mood, congruent and full affect, and goal directed and linear thoughts/associations.  (Tr. 1457.)  She expressed no suicidal or homicidal ideations. (*Id.*)  At a June 25, 2019 session, Ms. Tidmore's mental status exam was again normal, except that she showed prominent symptoms of fatigue, closing her eyes during the session.  (Tr. 1468.) She reported that she tried to stay active but became fatigued and experienced pain after activity. (*Id.*)  Some days, she was able to do more using cognitive strategies.  (*Id.*)  Dr. Stenroos noted that Ms. Tidmore experienced only some mild symptoms and generally functioned "pretty well." (Tr. 1469.)  Ms. Tidmore did not appear for her July 2019 therapy appointment.  (Tr. 1473.)

At a routine physical with Matthew Krohn, CNP, at CCFHC on December 11, 2019 (Tr. 1814-17), Ms. Tidmore reported her fatigue and migraines were improved, and she was walking for exercise (Tr. 1814).  On examination, she was alert and fully oriented, displayed normal behavior, and had normal thought content and judgment.  (Tr. 1817.)  Her recurrent major depressive disorder was stable, and her medications were not changed.  (Tr. 1816-17.)

Ms. Tidmore cancelled a therapy session scheduled for February 12, 2020.  (Tr. 1804.) She next saw Dr. Stenroos on August 13, 2020 via a telehealth visit.  (Tr. 1769-71; *see also* Tr. 2275-76.)  She reported stressors of two cousins contracting COVID-19 and of caring for her brother's nursing facility paperwork.  (Tr. 1770.)  On mental examination, her mood was

euthymic, her affect was full and congruent, her thoughts/associations were goal directed, linear, and organized, and she expressed no suicidal or homicidal ideations.  (*Id.*)  Dr. Stenroos diagnosed her with depressive disorder and noted that her symptoms were transient and expectable reactions to psychosocial stressors.  (Tr. 1771.)  Ms. Tidmore had a telehealth counseling session scheduled for September 9, 2020, but she did not appear.  (Tr. 1769, 2266.)

On March 11, 2021, Ms. Tidmore presented to Emily J. McFern, APRN, CNP, at CCFHC for a routine annual examination.  (Tr. 1763-67; *see also* Tr. 2226-30.)  She had stopped taking Celexa in March 2020 and was doing well.  (Tr. 1763.)  A mental examination showed normal attention and perception, cooperative behavior, and normal mood, speech, and thought content.  (Tr. 1766.)  APRN McFern noted that Ms. Tidmore's recurrent major depressive disorder was stable and ordered continuing follow-up with psychology.  (*Id.*)

At a routine physical on February 7, 2022, Ms. Tidmore told Allyson Lavinder, APRN, CNP, that she has some anxiety and had found therapy helpful but stopped attending due to the COVID-19 pandemic.  (Tr. 1758-60; *see also* Tr. 2188-90.)  She expressed a desire to restart seeing her therapist Dr. Stenroos (Tr. 1759) and was referred for a consult with psychology (Tr. 1760).  However, the record contains no further counseling treatment notes.

On August 15, 2022, Ms. Tidmore presented for an intake appointment with a podiatrist, who conducted a comprehensive examination.  (Tr. 1746-50.)  Relevant here, a psychological examination revealed intact recent/remote memory, normal mood/affect, and full orientation.  (Tr. 1749.)  Similarly, mental status exams during other medical care visits not discussed above generally showed a pleasant attitude, alert and fully oriented cognition, normal mood and affect, good eye contact, cooperative behavior, and normal thought content, judgment, speech, attention and perception.  (*See, e.g.*, Tr. 422, 503-04, 811.)

### 2.    Opinion Evidence

#### i.    Treating Source

On July 11, 2017, Dr. Adwalla completed an Attending Physician's Statement for Ms.

Tidmore's disability claim through her previous employer's insurance carrier.  (Tr. 1421-22.)

Dr. Adwalla indicated that Ms. Tidmore's primary diagnosis was depression.  (Tr. 1421.)  She

had been treating Ms. Tidmore since November 11, 2016, and stated that her prognosis was

"good – will take time."  (*Id.*)

Dr. Adwalla opined that Ms. Tidmore's physical impairments moderately limited her

functional capacity, and she was capable of clerical/administrative activity.  (Tr. 1422.)  She

opined that Ms. Tidmore's mental/nervous impairments resulted in marked limitations, making

her "unable to engage in stressful situations or engage interpersonal relations."  (*Id.*)  Dr.

Adwalla did not include any explanations for these opinions.  (*Id.*)

#### ii.    Consultative Examiner

On May 17, 2018, Ms. Tidmore underwent a consultative psychological evaluation with

J. Joseph Konieczny, Ph.D.  (Tr. 953-56.)  Dr. Konieczny conducted a clinical interview of Ms.

Tidmore and reviewed her Cleveland Clinic treatment records from 2016.  (Tr. 953.)

Ms. Tidmore's daughter drove her to the evaluation.  (*Id.*)  Ms. Tidmore was pleasant,

cooperative, and appeared to be an adequate historian.  (*Id.*)  She informed Dr. Konieczny that

she had mixed connective tissue disease, migraines, and a past stroke.  (*Id.*)  She also reported a

history of depression and recent feelings of depression, which she attributed to the onset of her

other medical issues.  (Tr. 954.)  She experienced crying episodes once a week and felt frustrated

and despondent regarding her medical problems.  (*Id.*)  She denied past thoughts of suicide or a

history of suicide attempts.  (*Id.*)  She showed no indications of nervousness or anxiety, but

stated she was "a nervous kind of person." (*Id.*)  She denied auditory or visual hallucinations and did not present as delusional, paranoid, or given to grandiose thinking. (*Id.*)

On mental status examination, Ms. Tidmore's grooming and hygiene were adequate. (*Id.*)  Her movements and walking were somewhat slow and labored, and she complained of pain in her feet, legs, and shoulders without appearing to emphasize her symptoms. (*Id.*)  She was somewhat disorganized in her presentation but also pleasant and cooperative; she responded to all questions and tasks posed to her. (*Id.*)  She reported mood swings and a quick temper when in pain but showed no signs of undue impulsivity. (*Id.*)  Her motivation and participation during the evaluation were adequate, but she stated that her motivation overall had "been bad." (*Id.*)  She seemed capable of expressing herself in a clear and coherent manner and displayed no looseness of associations or tangentiality in her conversation. (*Id.*)  She reported difficulties sleeping due to pain and racing thoughts, denied significant weight gain, and described her energy levels as "terrible." (Tr. 955.)  She maintained appropriate eye contact; was oriented to person, place, and time; showed no impairment in concentration and attention; performed serial three subtraction without error; recalled three of three objects after five minutes; spelled the word "World" backwards; could understand a simple aphorism; and showed no deficits in her general fund of knowledge or in her ability to perform abstract reasoning. (*Id.*)

Ms. Tidmore displayed fair insight and showed no deficits in her judgment or awareness of social rules. (*Id.*)  She appeared "capable of managing her own daily activities and in handling her financial affairs without assistance," and her "overall level of functioning [was] at a slightly reduced level of efficiency" reflecting her perceived physical limitations. (*Id.*)

Dr. Konieczny diagnosed Ms. Tidmore with other specified depressive disorder and depressive episodes with insufficient symptoms. (*Id.*)  He further provided a functional

10

assessment of her mental abilities in the four categories of mental functioning, as follows.  (Tr. 955-56.)  With respect to understanding, remembering, and carrying out instructions, he opined that Ms. Tidmore showed no obvious limitations.  (Tr. 955.)  With respect to maintaining attention, concentration, persistence, and pace, he opined that she showed no obvious limitations. (*Id.*)  With respect to responding appropriately to supervision and coworkers in a work setting, Dr. Konieczny opined that Ms. Tidmore seemed capable of responding appropriately under normal work situations; however, due to her depressive symptoms, she would have some diminished tolerance for frustration and diminished coping skills that would impact her ability to respond to "severe supervision and interpersonal situations in a work setting."  (Tr. 956.)  With respect to responding appropriately to work pressures, Dr. Konieczny again opined that Ms. Tidmore seemed capable of responding appropriately under normal work situations; however, due to her depressive symptoms, she had a diminished tolerance for frustration and diminished coping skills that impacted her ability to respond to "severe pressure" in a work setting.  (*Id.*)

### iii.    State Agency Medical Consultants

On May 31, 2018, state agency psychological consultant Joseph Edwards, Ph.D., performed a Psychiatric Review Technique ("PRT") assessment.  (Tr. 87.)  He found that Ms. Tidmore had no limitations in her ability to understand, remember, or apply information, and mild limitations in her abilities to interact with others, concentrate persist, and maintain pace, and adapt or manage oneself.  (Tr. 87.)  He also found that her depression and anxiety were not severe impairments (*id*.) and therefore did not make a mental RFC determination.  On September 13, 2018, on reconsideration, Kristen Haskins, Psy.D., affirmed Dr. Edwards's PRT and mental RFC findings.  (Tr. 102.)

11

C.      **Function Reports**

Ms. Tidmore completed an Adult Function Report on March 5, 2018.  (Tr. 254-61.)  She lived alone in a house.  (Tr. 254.)  She stated she was unable to work because she had anxiety, unpredictable migraines, and severe pain in her legs, feet, and hands.  (*Id.*)

Regarding daily activities, Ms. Tidmore stated that she took her grandchildren to school or the bus stop when she did not have pain or doctor's appointments.  (Tr. 255.)  Otherwise, she prepared her meals and did light housework if she was not in pain.  (*Id.*)  Her sister took the grandchildren to school at times.  (*Id.*)  Ms. Tidmore was able to shave, feed herself, and use the toilet without problem.  (Tr. 255.)  Dressing, bathing, and caring for her hair took much longer than they used to, and she could not stand for long periods due to dizziness.  (*Id.*)

Ms. Tidmore cared for her grandchildren by taking them to school when able and by preparing some meals.  (*Id.*)  Three or four times a week, she prepared small meals with help from her granddaughter.  (Tr. 256.)  It took 30 minutes to an hour.  (*Id.*)  Due to her conditions, she could not use her hands as before.  (*Id.*)  She did light cleaning, folded laundry, ironed, and dusted two to three times a week for one hour.  (*Id.*)  She needed help and encouragement to complete these tasks because of her anxiety and depression.  (*Id.*)  Doing house or yardwork made her dizzy and caused her heart to race.  (Tr. 257.)

Before her illness or conditions, Ms. Tidmore could work, do household chores, and write properly.  (Tr. 255.)  Her conditions affected her sleep in that she only slept for two to three hours at a time due to pain.  (*Id.*)  She needed reminders to care for personal needs and grooming and to take medication because her memory had worsened since her stroke.  (Tr. 256.)  She used phone reminders, Post-it notes, and a calendar.  (*Id.*)

12

Ms. Tidmore went outside five times a week unless she had migraines.  (Tr. 257.)  She went out for a short time to go to the doctor or get the mail.  (*Id.*)  She drove or rode in a car when needed, and sometimes went out alone.  (*Id.*)  She sometimes drove short distances.  (*Id.*)  She completed shopping in stores, by phone, by mail, and by computer bi-weekly or monthly.  (*Id.*)  It took about an hour depending on if she had assistance.  (*Id.*)

Ms. Tidmore was able to pay bills, count change, and use a checkbook/money order, but she could not handle a savings account because she could not "juggle a lot."  (*Id.*)  Her hobbies included reading, watching television, and listening to audio books three or four times a week.  (Tr. 258.)  Due to her conditions, she could no longer read for long periods.  (*Id.*)

Ms. Tidmore reported no problems getting along with other people.  (Tr. 259.)  She socialized at church weekly and at the parent-teacher association or other school meetings monthly.  (Tr. 258.)  Her conditions affected her social activities in that she was not able to drive for long, she had a lot of anxiety, and she could only attend short social events.  (Tr. 259.)  She needed reminders to go places but did not need someone to accompany her.  (*Id.*)  She got along well with authority figures and had never been fired or laid off from a job because of problems getting along with other people.  (Tr. 260.)

Ms. Tidmore indicated that her conditions affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember, complete tasks, concentrate, understand, and use her hands.  (Tr. 259.)  This was due to a past stroke, headaches, dizziness, neuropathy in her feet, heart palpitations, poor writing and memory, and mixed connective tissue disease.  (*Id.*)

Ms. Tidmore is right-handed.  (*Id.*)  She could walk 500 feet before needing to stop and rest for five minutes.  (*Id.*)  She could maybe pay attention for 20 minutes.  (*Id.*)  She did not

finish what she started, could follow short written instructions, and could follow spoken instructions if given in part without much detail. (*Id.*)

Ms. Tidmore did not handle stress or changes in routine well. (Tr. 260.) She had noticed unusual behavior and fears in the form of anxiety, depression, excessive heartrate, and crying. (*Id.*) In 2017, she was prescribed glasses, which she wore daily. (*Id.*) She took medications that caused some side effects, including dizziness, tiredness, racing heart, nausea, stomach discomfort, and tingling in hands/feet. (Tr. 261.)

### D.     Relevant Hearing Testimony

####     1.     Plaintiff's Testimony

#####          i.     2019 Hearing

At the hearing on September 25, 2019, Ms. Tidmore testified in response to questions from the ALJ and her attorney. (Tr. 35-77.) She lived with her daughter and five grandchildren. (Tr. 41-42.) Ms. Tidmore's daughter worked full time, but Ms. Tidmore had no income herself. (Tr. 42.) She had a driver's license but rarely drove; her grandchildren were old enough to drive her places. (Tr. 43.) Regarding her past education, Ms. Tidmore testified that she had a high school degree and a certificate from a Bible college. (*Id.*) She was not working anywhere. (*Id.*)

Previously Ms. Tidmore had worked at two different banks performing the following positions: garnishment customer support, garnishment processor, check processor, check adjuster, and electronic payment processor. (Tr. 43-51.) She had also previously held positions doing data entry, recruiting, and customer service/billing. (Tr. 52-55.)

Ms. Tidmore testified she was prevented from working by mixed connective tissue disease. (Tr. 55.) She has had multiple bouts with it and was usually able to take a few weeks of leave and "bounce back." (Tr. 55-56.) However, the last time, she could not "spring back"

14

because she had a stroke at work.  (Tr. 56.)  This caused things to spiral, including her memory problems and issues with her hands.  (*Id.*)  After the stroke, Ms. Tidmore noticed she could not remember things and was making customers upset at work because she could not understand or retain what they were saying.  (*Id.*)  She could not understand her own writing and was making mistakes.  (*Id.*)  She received an oral warning about the days she was missing, then was written up due to her mistakes.  (Tr. 56-57.)  This had been "messing with [her]" because she had always prided herself on her work.  (Tr. 57.)  Ms. Tidmore had contacted her internal medicine doctor who ordered a CAT scan that revealed what was going on.  (*Id.*)

Since that time, Ms. Tidmore found herself not remembering certain things.  (*Id.*)  Her neurologist thought her memory issues were unchanged.  (*Id.*)  Ms. Tidmore had not lived alone since 2017.  (Tr. 65.)  Her granddaughters helped her with laundry, housework, and cooking. (Tr. 66.)  Regarding personal care, she used a shower chair and a pull-down shower head.  (*Id.*)

On a typical day, Ms. Tidmore was always lying down due to fatigue.  (Tr. 57.)  The fatigue was her biggest struggle since the stroke.  (*Id.*)  She took three or four naps a day and did not wake up feeling refreshed.  (Tr. 61.)  At night, she only slept a couple of hours at a time due to night sweats and aches and pains in her legs, shoulders, feet, and hands.  (Tr. 61.)  The fatigue also interfered with her ability to focus, so she could not do things she used to do, like read.  (Tr. 61-62.)  Due to fatigue and possible depression, she had no interest in doing anything.  (Tr. 62.)

At home, Ms. Tidmore did very minimal chores like straightening her bed and washing a dish she had used.  (Tr. 58.)  She thought this affected her depression because of who she used to be.  (*Id.*)  She did not do laundry or go grocery shopping—her daughter did those things.  (*Id.*) She did not have any hobbies.  (*Id.*)  When she woke up in the morning, she would eat something, then sit down if she did not have any appointments.  (Tr. 59.)  She went to as many of

her appointments as she could, but she sometimes missed them due to migraines.  (*Id.*)  Her daughter or sister took her to appointments.  (*Id.*)

Ms. Tidmore took medications for high blood pressure, dizziness, foot problems, and migraines.  (Tr. 59-60.)  The migraine medication had made her sick, so she switched to taking a multivitamin and Tylenol.  (Tr. 60.)  Ms. Tidmore saw a psychologist for depression.  (Tr. 58.)  Her doctor had put her on medication, but it only made her more fatigued, so the doctor sent her to a psychologist.  (*Id.*)  She had been seeing the psychologist for a year or two.  (*Id.*)

To address her joint pain, Ms. Tidmore soaked in Epsom salt every other day.  (Tr. 62.)  To help her knee pain due to lost cartilage, she laid down and stretched.  (*Id.*)  Her knees hurt, popped, and locked up in her sleep.  (*Id.*)  She also had spasms in her legs when standing and muscle spasms in her back and chest.  (Tr. 63.)  Her rheumatologist thought it may be part of the mixed connective tissue disease.  (*Id.*)  Ms. Tidmore also had problems with her vision.  (Tr. 63-64.)  Her left eye was blurry because of a blockage.  (Tr. 64.)  Headaches started in her eye, and sometimes her left eye felt heavy.  (*Id.*)  She did not recall the medical terms for this.  (*Id.*)

Ms. Tidmore testified she had headaches almost daily and had one at the hearing.  (*Id.*)  She felt true migraines starting if she was in the light too long and began seeing spots in her eyes.  (Tr. 64-65.)  She had migraines about three or four times a month.  (Tr. 65.)  They were better if she kept her shades down.  (*Id.*)

Regarding her depression, Ms. Tidmore said the "whole ordeal" had been overwhelming because she had been a worker her entire life and not being able to work was "really depressing."  (*Id.*)  She tried not to talk about it because it was emotional.  (*Id.*)

ii.     **2022 Hearing**

At the hearing on December 1, 2022, Ms. Tidmore testified in response to questioning by the ALJ and her attorney.  (Tr. 1521-40.)  She still lived with her daughter and five grandchildren.  (Tr. 1527.)  She could drive, but she preferred not to.  (Tr. 1527-28.)

Since the 2019 hearing, Ms. Tidmore's conditions had worsened, and she had fallen.  (Tr. 1528-29.)  The fall took place right before the Covid-19 pandemic.  (Tr. 1529.)

At the time of the hearing, Ms. Tidmore was not taking any medications to treat her psychological symptoms because the depression medication she had been taking did not help. (*Id.*)  She thought it made her feel jittery and like her heart was racing.  (*Id.*)  She said she had seen a therapist in the past.  (*Id.*)  She then said she had "seen a psychologist since October 10" and had to go back to her.  (Tr. 1529-30.)  But she did not want to get emotional from therapy. (Tr. 1530.)  When she went to therapy, she left feeling more emotional and messed up than before from repeatedly explaining her problems.  (*Id.*)

On a typical day, Ms. Tidmore got up and visited with her daughter, and her daughter prepared food for her.  (*Id.*)  She did her daily bathroom routine and did whatever she could in the kitchen if she was physically able.  (*Id.*)  She stretched a bit and would maybe ride with her daughter to the store, but there was not much she could do.  (*Id.*)  Most of the time she laid down.  (*Id.*)  Sometimes, after she found herself lying down for days, she would try to sit up or her daughter would make her get up and go out with her.  (*Id.*)  Sometimes she helped her granddaughter with homework.  (*Id.*)  She did not volunteer anywhere because she could not "go much of anywhere."  (Tr. 1531.)  She sometimes accompanied her daughter to the grocery store or to work as a minister.  (*Id.*)

Regarding the symptoms of her depression and anxiety, Ms. Tidmore testified that some days she would not get up, and her daughter would have to make her get up.  (Tr. 1532.)  Going out had caused her anxiety for a couple of years.  (*Id.*)  She would feel panicked and breathless, and her heart would beat "really fast."  (*Id.*)  This led to a prior referral to a cardiologist, but it was a panic attack.  (*Id.*)  For years, she had felt like she could not get out of bed due to her depression.  (*Id.*)  While she did go to church with her daughter sometimes, she had anxiety every time.  (*Id.*)  Due to pain in her hips, she could not sit long in the pews so sometimes she would not go to church.  (Tr. 1533.)

### 2. Vocational Expert's Testimony at 2022 Hearing

A Vocational Expert ("VE") testified that a hypothetical individual of Plaintiff's age, education, and work experience, with the functional limitations described in the ALJ's RFC determination, could perform Ms. Tidmore's past work as follows: insurance clerk, generally and as performed; recruiter, generally and as performed; customer service as generally performed; and check processor as generally performed.  (Tr. 1535-36.)

If the hypothetical individual had the added limitations of not directing others' work, no negotiations or arbitrations, and occasionally handling, fingering, and feeling, the VE testified they would not be able to perform Plaintiff's past work.  (*Id.*)  If the individual could handle, feel, and finger frequently, but could not engage in negotiations, confrontation, directing others, or fast-paced production, only the data entry clerk position would be available.  (*Id.*)

If the individual was limited to unskilled work because of chronic pain, fatigue, and memory issues, the VE testified that they could not perform any of Plaintiff's past work.  (Tr. 1538.)  The VE also testified that more than two absences a month and being off task more than 15% of the workday would be work preclusive.  (Tr. 1537-38.)

18

### III.  Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform other work available in the national economy.  *Id.*

## IV.    The ALJ's Decision

In his January 13, 2023 decision, the ALJ made the following findings:[1]

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2022.  (Tr. 1496.)

2.    The claimant has not engaged in substantial gainful activity since March 1, 2017, the alleged onset date.  (*Id.*)

3.    The claimant has the following severe impairments: stroke, mixed connective tissue disease, lupus, bilateral hip replacements, breathing disorder, osteoarthritis and allied disorders, and peripheral neuropathy. (Tr. 1497.)

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 1501.)

5.    The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can: lift 20 pounds occasionally and 10 pounds frequently; carry 20 pounds occasionally and 10 pounds frequently; sit for six hours, stand for four hours, and walk for four hours; occasionally push and pull with all four extremities; frequently handle, finger, and feel items bilaterally; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, and crouch; and never crawl. She can never work at unprotected heights or near dangerous moving mechanical parts, can never engage in commercial driving, and cannot work in vibration.  (Tr. 1502-03.)

6.    The claimant is capable of performing past relevant work as a financial customer service representative, a check clerk, a data entry clerk, and an insurance clerk. This work does not require the performance of work-related activities precluded by the claimant's RFC.  (Tr. 1511.)

---

[1] The ALJ's findings are summarized.

Based on the foregoing, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from March 1, 2017, through the date of the decision on January 13, 2023.  (Tr. 1513.)

## V.    Plaintiff's Arguments

In her sole assignment of error, Plaintiff argues that the ALJ's RFC is not supported by substantial evidence because the ALJ erred by (1) finding the mental impairments non-severe and (2) failing to account for the mental impairments in the RFC.  (ECF Doc. 8, pp. 12-18.)

## VI.    Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006)

(citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.      Sole Assignment of Error: The ALJ's Findings Regarding Plaintiff's Mental Impairments at Steps Two and Four Were Supported by Substantial Evidence**

Ms. Tidmore argues that the ALJ failed to comply with the prior Magistrate Judge's remand order and that his RFC was not supported by substantial evidence because he did not consider her mental impairments severe and did not address them when formulating his RFC. (ECF Doc. 8, pp. 12-18.)  The Commissioner responds that the ALJ discussed Ms. Tidmore's

mental impairments at length when determining the RFC and that his findings are supported by substantial evidence.  (ECF Doc. 9, pp. 6-9.)

### 1.     Legal Standard for Step Two Determinations

A claimant bears the burden of showing the severity of her impairments.  *Foster v. Sec'y of Health & Hum. Servs.,* 899 F.2d 1221, at *2 (6th Cir. 1990) (unpublished table decision) (citing *Murphy v. Sec'y of Health & Hum. Servs.*, 801 F.2d 182, 185 (6th Cir. 1986)).  A "severe" impairment is defined under the regulations as "any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities."  *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 428 (6th Cir. 2007) (quoting 20 C.F.R. § 404.1520(c)); *see also Long v. Apfel*, 1 F. App'x 326, 330-32 (6th Cir. 2001).

In evaluating a mental impairment, an ALJ must rate the claimant's degree of functional limitation in four broad areas of mental functioning using a five-point scale including: none, mild, moderate, marked, and extreme.  20 C.F.R. § 404.1520a(c), (e)(4).  The four broad areas of mental functioning are: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself.  20 C.F.R. § 404.1520a(c)(4).  "The four broad functional areas are also commonly referred to as the 'paragraph B' criteria."  *Avers v. Kijakazi*, No. 3:20-CV-01433, 2021 WL 4291228, at *9 (N.D. Ohio Sept. 21, 2021) (citation omitted).  If a claimant's degree of limitation is rated "as 'none' or 'mild,'" the conclusion will generally be that a claimant's "impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in [a claimant's] ability to do basic work activities."  20 C.F.R. § 404.1520a(d)(1).

The Sixth Circuit has construed Step Two as a de minimis hurdle, explaining that "an impairment can be considered not severe only if it is a slight abnormality that minimally affects

work ability regardless of age, education, and experience." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). "The goal of the test is to 'screen out totally groundless claims.'" *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (*quoting Farris v. Sec'y of Health & Hum. Servs.*, 773 F.2d 85, 89 (6th Cir.1985)). Although the standard is de minimis, it is recognized that a diagnosis alone "says nothing about the severity of the condition." *Higgs*, 880 F.2d at 863; *see also Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 930 (6th Cir. 2007) ("The mere existence of those impairments, however, does not establish that [claimant] was significantly limited from performing basic work activities for a continuous period of time.").

In *Maziarz v. Sec'y of Health & Hum. Servs.*, 837 F.2d 240 (6th Cir. 1987), the Sixth Circuit held that it is not reversible error for the Commissioner to deem an impairment "non-severe" in a case where other impairments have been found "severe," since the Commissioner could properly consider non-severe impairments in assessing the RFC. *See id.* at 244; *see also Anthony*, 266 F. App'x at 457 (finding it "legally irrelevant" that some impairments were not deemed severe because the ALJ could consider "severe and non-severe impairments in the remaining steps of the sequential analysis"); *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003) (finding "the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence" when ALJ found a severe impairment). Conversely, a failure to consider a non-severe impairment in assessing the RFC has been found to be reversible error. *See Simpson v. Comm'r of Soc. Sec.,* 344 F. App'x 181, 190-191 (6th Cir. 2009) (distinguishing *Maziarz* and finding reversible error when an ALJ found a non-severe mental impairment "would not be considered in assessing her RFC"); *cf. Pompa,* 73 F. App'x at 803 (finding harmless error where the "ALJ considered all of [plaintiff]'s impairments in her residual functional capacity assessment").

More recently, in *Napier v. Comm'r of Soc. Sec.*, 127 F.4th 1000 (6th Cir. 2025), the Sixth Circuit considered a challenge to an ALJ's Step Two findings without applying a harmless error analysis.  Instead, the *Napier* court applied a substantial evidence analysis in assessing whether the ALJ erred in finding mental impairments non-severe at Step Two, or by failing to incorporate mental limitations into the RFC at Step Four.  *Id.*

**2.      The ALJ's Findings Regarding the Mental Impairments at Steps Two and Four of the Sequential Analysis Were Supported by Substantial Evidence**

In her sole assignment of error, Ms. Tidmore challenges the ALJ's finding at Step Two that her mental impairments "do not cause more than minimal limitation in [her] ability to perform basic mental work activities and are therefore non-severe" (Tr. 1497), and his finding at Step Four that "the record does not demonstrate that the claimant's mental impairments cause any significant mental functional limitation" (Tr. 1508), arguing these findings "constitute[] legal error and warrant[] remand."  (ECF Doc. 8, pp. 12-13.)  In support, she asserts that "the evidence confirms" that her mental impairments "cause more than minimal limitation in her ability to perform work-related activities" and that "the ALJ failed to comply with the Court's order as he failed to discuss the impact of Plaintiff's mental health impairments when determining the RFC after Step 2 of the sequential evaluation."  (*Id.* at p. 15.)

In response, the Commissioner notes that the ALJ's written decision discusses the same evidence highlighted in Plaintiff's brief, and asserts that "Plaintiff does not acknowledge that the ALJ discussed the same evidence, nor does she explain how this evidence contradicts the ALJ's decision[.]"  (ECF Doc. 12, pp. 7-8.)  Ultimately, the Commissioner argues that the ALJ's analysis was within the "zone of choice" afforded to decisionmakers under the substantial evidence standard, and that Plaintiff has failed to "identif[y] any specific error in the ALJ's discussion of her testimony or evaluation of the opinion evidence."  (*Id.* at p. 8.)

A review of the ALJ's comprehensive analysis bears out the Commissioner's arguments. At Step Two, the ALJ provided a detailed and lengthy discussion of Ms. Tidmore's subjective complaints, reported activities of daily living, and medical treatment records, detailing clinical findings and prescribed treatments, in support of his conclusion that Ms. Tidmore's depressive disorder and anxiety disorder "do not cause more than minimal limitation in [her] ability to perform basic mental work activities and are therefore non-severe" and "cause no more than 'mild' limitation in any of the functional areas <u>and</u> the evidence does not otherwise indicate that there is more than a minimal limitation in [her] ability to do basic work activities[.]"  (Tr. 1497-1500 (emphasis in original).)  He specified that he had "considered all of [Ms. Tidmore's] medically determinable impairments, including those that are not severe, when assessing [her] residual functional capacity."  (Tr. 1497.)

At Step Four, the ALJ highlighted the clinical findings and other information in Ms. Tidmore's treatment records when he found that "the generally unremarkable mental status exam findings and routine mental health treatment in the record are inconsistent with the claimant's allegations of significant mental functional limitation."  (Tr. 1503-04 (citing Tr. 422, 503-04, 811, 880-81, 974, 1248, 1252, 1257, 1262, 1457, 1468, 1766, 1817, 2275).)  The ALJ again discussed in detail Ms. Tidmore's subjective complaints, reported activities of daily living, and medical treatment records in support of his finding that "the record does not demonstrate that the claimant's mental impairments cause any significant mental functional limitation."  (Tr. 1507-08.)  Further, the ALJ discussed the medical opinions of the state agency psychological consultants, who opined that Ms. Tidmore had no more than mild limitations in mental functioning, deeming those opinions "persuasive because they are well-supported by the referenced objective medical evidence, which does not suggest significant functional limitation."

(Tr. 1510-11.)  In contrast, the ALJ found the opinions of the psychological consultative examiner and Ms. Tidmore's primary care provider unpersuasive.  (Tr. 1511.)  The consultative examiner's opinion was found unpersuasive because it was not well supported by the examiner's own mental status findings "which were generally mild and do not suggest significant mental functional limitation," it appeared to be "primarily based on the claimant's own subjective reports of symptoms," and it was inconsistent with the record as a whole, which included "generally unremarkable mental status exam findings and routine mental health treatment[.]" (*Id.*)  The treating provider's opinion was found unpersuasive because it was "not supported by reference to objective medical evidence or explanation for why the objective medical evidence directs the stated limitations" and because it was inconsistent with medical records reflecting unremarkable exams and routine treatment.  (*Id.*)  Thus, the ALJ offered a detailed and thorough analysis of the entire evidentiary record in support of his decision not to incorporate mental limitations in the RFC at Step Four.  (Tr. 1502-11.)

Considering the thorough analysis outlined above, the Court finds Plaintiff's assertions that "there was no indication that the ALJ considered Plaintiff's mental limitations after the Step 2 analysis" (ECF Doc. 8, p. 12) and that the ALJ "failed to comply with the Court's order . . . to discuss the impact of Plaintiff's mental health impairments when determining the RFC" (*id.* at p. 15) are unsupported by the record and without merit.  On the contrary, the ALJ's findings that Ms. Tidmore's mental impairments caused her no more than minimal work-related limitations, and were therefore non-severe, were clearly supported by substantial evidence.  Although Ms. Tidmore argues generally that "the ALJ failed to properly analyze Plaintiff's mental impairment after the Step 2 analysis" (*id.* at p. 18), she does not identify material evidence that the ALJ failed to consider, nor does she suggest that the ALJ mischaracterized the records.  The Court's

independent review of the record comports with the ALJ's findings.  Accordingly, the Court concludes that the ALJ was supported by substantial evidence when he found the mental impairments to be non-severe and did not include mental limitations in the RFC.  *See Napier*, 127 F.4th 1000 (upholding finding that mental impairments were non-severe when substantial evidence supported that finding and upholding the adoption of an RFC without mental limitations when the ALJ explained that he considered mental functioning in assessing the RFC).

Ms. Tidmore argues that the evidence highlighted in her brief "support[s] her argument that her depression, while not necessarily at listing level or disabling on its own, is in fact a severe impairment by SSA's definition and the effects of her depression should have been included in the RFC."  (ECF Doc. 8, p. 16.)  But "'[t]he substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakely*, 581 F.3d at 406 (internal citation omitted).  Regardless of whether there is substantial evidence to support Ms. Tidmore's position, this Court cannot overturn the ALJ's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477.

For the reasons set forth above, the Court finds that Ms. Tidmore has not met her burden to show that the ALJ did not comply with the remand order or otherwise erred in his consideration of Plaintiff's mental impairments at Steps Two or Four of the sequential analysis.  Accordingly, the Court finds Ms. Tidmore's sole assignment of error to be without merit.

## VII.    Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's final decision.


September 30, 2025


/s/Amanda M. Knapp
AMANDA M. KNAPP
United States Magistrate Judge

29